**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>AMERICAN VIRTUAL CLOUD<br>TECHNOLOGIES, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-10020 (MFW)<br><br>(Jointly Administered)<br>**Hearing Date: February 7, 2023 at 3:00 p.m. (ET)**<br>**Obj. Deadline: January 31, 2023 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) AUTHORIZING AND APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO A STALKING HORSE AGREEMENT AND PROVIDE BID PROTECTIONS THEREUNDER, (C) AUTHORIZING AND APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, (D) SCHEDULING AUCTION AND SALE APPROVAL HEARING, (E) APPROVING THE FORM AND MANNER OF THE NOTICE OF THE SALE HEARING, AND (F) GRANTING RELATED RELIEF, AND (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, AND (C) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**" and together with the Debtors' non-debtor foreign subsidiaries, the "**Company**") hereby file this motion (the "**Motion**"), under sections 105(a), 363, 365, and 503 of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 2002, 6004, 6006, 9007, and 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"), (i) authorizing and approving

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: American Virtual Cloud Technologies, Inc. (2421), AVCtechnologies USA, Inc. (8886), and Kandy Communications LLC (5853). Each Debtor's corporate headquarters is 1720 Peachtree Road, Suite 629, Atlanta, Georgia 30309.

sale and bidding procedures (the "**Bidding Procedures**"), pursuant to which the Debtors will solicit and select the highest or otherwise best offer for the sale (the "**Sale**") of all or substantially all of the Debtors' Assets (as defined below); (ii) authorizing the Debtors to select a stalking horse bidder and provide bid protections; (iii) authorizing and approving procedures for the assumption and assignment of executory contracts and unexpired leases in connection with the Sale, including notice of proposed cure amounts; (iv) scheduling an auction (the "**Auction**"), if necessary, and a hearing to approve the Sale (the "**Sale Hearing**"); (iv) approving the form and manner of notice of the Sale Hearing; and (v) granting related relief.

The Debtors further request that, at the Sale Hearing, this Court enter one or more orders (each, a "**Sale Order**"), as applicable, (i) approving the Sale of the Debtors' assets to the ultimate purchaser of such assets as determined in accordance with the Bidding Procedures (the "**Successful Bidder**"), free and clear of all liens, claims, interests and encumbrances (collectively, the "**Interests**"); (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Kevin J. Keough in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 9] (the "**First Day Declaration**").[2]  In further support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

§ 157(b).  Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment

or order with respect to this Motion if it is determined that the Court would lack Article III

jurisdiction to enter such final judgment or order absent consent of the parties.  Venue of these

cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory

predicates for the relief requested herein are sections 105(a), 363, 365, and 503 of the

Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, and Local Rule

6004-1.

## BACKGROUND

2.      On January 11, 2023 (the "**Petition Date**"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The factual

background regarding the Debtors, including their business operations, their capital structures,

and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day

Declaration.

3.      The Debtors continue to manage and operate their businesses as debtors in

possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner

has been requested in the Chapter 11 Cases and no committees have yet been appointed.

## RELIEF REQUESTED

4.      By this Motion, the Debtors request entry of the following:

a.      the Bidding Procedures Order,

i.      authorizing and approving the Bidding Procedures, substantially in
the form attached to the Bidding Procedures Order as Exhibit 1, in connection with the
Sale of substantially all of the Debtors' assets, including, but not limited to, contracts,
intellectual property, furniture, fixtures, and equipment (collectively, the "**Assets**");

ii.     authorizing the Debtors to select a stalking horse bidder following
the hearing, if not secured prior to such date, and provide bid protections;

64863/0001-44342174v1

iii.     scheduling an Auction for the Assets, if necessary, for March 7, 2023;

iv.     scheduling the Sale Hearing to consider approval of the Sale on or before March 13, 2023;

v.     authorizing and approving (A) notice of the Sale, the Bid Deadline (as defined below), the Auction and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "**Auction and Sale Notice**"), (B) publication of the contents of the Auction and Sale Notice in The Wall Street Journal, The New York Times or USA Today (the "**Publication Notice**"), and (C) notice to each relevant non-Debtor counterparty (each, a "**Contract Counterparty**," and collectively the "**Contract Counterparties**") to an executory contract or unexpired lease related to the Assets of the potential assumption and assignment of their executory contract or unexpired lease (collectively, the "**Contracts and Leases**") and the calculation of the amount necessary to cure any monetary defaults thereunder (the "**Cure Amounts**"), substantially in the form attached to the Bidding Procedures Order as Exhibit 3 thereto (the "**Cure Notice**");

vi.     authorizing and approving procedures for the assumption and assignment of the Contracts and Leases and the determination of Cure Amounts with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and

vii.     granting related relief.

b.     the Sale Order, authorizing and approving the following:

i.     the sale of the Assets to the Successful Bidder free and clear of all Interests;

ii.     the assumption and assignment of certain Contracts and Leases in connection with the proposed Sale; and

iii.     granting related relief.

## THE DEBTORS' ASSETS

5.     The Debtors offer cloud-based business communication services to customers looking to transition business-critical services, phone services and other business applications to the cloud. The Debtors' "Kandy" product is one of the largest pure-play providers of unified communications as a service ("**UCaaS**"), communications platform as a service ("**CPaaS**"), and Microsoft Teams Direct Routing as a Service ("**DRaaS**") for blue-chip enterprise customers such as AT&T, IBM/Kyndryl, and Etisalat. Kandy enables service providers, enterprises, software

4

vendors, systems integrators, partners, and developers to enrich their applications and services with real-time contextual communications, providing a more engaging user experience. With Kandy, companies of all sizes and types can quickly embed real-time communications capabilities into their existing applications and business processes.

6.     The Assets are related to the Company's business units, including (i) its UCaaS unit (the "**UCaaS Unit**") and (ii) its CPaaS unit (the "**CPaaS Unit**"), which includes its DRaaS and its API Marketplace service offerings (collectively, the "**Business Units**" and each a "**Business Unit**").[3]  The Assets will include, in part, (i) all customer contracts and statements of work related to the Business Units; (ii) all hardware and software currently used in each Business Unit; (iii) all other equipment, furniture and other tangible items used in each Business Unit; and (iv) all patents, tradenames, websites, and copyrights.

## Prepetition Marketing and Sale Process

7.     In or around July 2022, the Debtors retained SOLIC Capital Advisors, LLC ("**SOLIC**") to assist the Debtors in analyzing their financial position and exploring potential strategic and operating restructuring initiatives.   In conjunction therewith, the Debtors shortly thereafter engaged investment banker, Northland Capital Markets ("**Northland**"), a firm with extensive contacts and experience in the communications technology sector, including enterprise

---

[3]     The Debtors operate the Business Units as a single integrated enterprise, *e.g.*, with shared servers, cross-over employees and single master agreements.  In an effort to maximize value, prior to the Petition Date, the Debtors undertook efforts to analyze how they could implement the functional business segmentation of the Business Units to feasibly position the Business Units for the pursuit of strategic alternatives in one (1) or more Business Unit sales.  As that process was underway, potential acquirors were given the opportunity to submit bids for one (1) or more Business Units and potential bidders have expressed interest in acquiring only a single Business Unit.  That notwithstanding, and while the Debtors believe there exists the possibility that the Business Units could be segmented, such efforts would be time consuming and bear a substantial cost and implementation risk.  As a result, and because the Debtors believe they can secure bids for all of the Assets, the Debtors have determined to focus on bids for the entirety of the Assets rather than bids for the separate Business Units.

cloud services, to advise the Company in connection with a comprehensive strategic review process that could lead to the sale of the Company or selected assets.

8.    Beginning in August 2022, Northland, with the assistance of SOLIC, commenced an extensive process to market the Debtors' assets for sale to numerous likely prospective purchasers.  This process included Northland using its industry and restructuring bankers, and its proprietary databases and market knowledge, to identify a broad group of potential strategic and financial buyers and solicit their interest, preparing and sending "teasers" summarizing the Debtors' assets, preparing and circulating marketing and diligence materials and, with the assistance of SOLIC, creating a virtual data room containing myriad information about the Debtors, their assets, their liabilities and all aspects of their businesses.

9.    Since the beginning of the marketing process, Northland has contacted seventy-nine (79) potential financial and strategic purchasers.  As a result of these efforts, twenty-nine (29) parties executed nondisclosure agreements, indicating an interest to further explore a potential transaction with the Debtors.  In addition, prior to the Petition Date, the Company held sixteen (16) management presentations for prospective buyers.

10.    Although approximately seventy (70) entities have declined to further participate in the sale process, several continue to undertake diligence efforts.

11.    Based on the robust marketing process to date, the Debtors believe there is interest in the Assets.  Indeed, to date, the Company has received, subject to further due diligence, three (3) written term sheets/letters of intent and at least one other verbal expression of interest.  The Debtors remain engaged with each these potential suitors.

12.    The Debtors have chosen to use these Chapter 11 Cases to continue their marketing efforts and run a robust sale process, including an auction, so that the Debtors can

64863/0001-44342174v1

ultimately realize the highest and otherwise best value for the benefit of all parties in interest. The Debtors believe that a chapter 11 marketing process – together with the tools afforded to debtors-in-possession, including the ability to sell assets free and clear under section 363 of the Bankruptcy Code – is the optimal way to consummate a transaction that delivers optimal value to stakeholders.

13. The Debtors propose the following timeline for the Sale of the Assets, subject to the Court's availability:

| EVENT | PROPOSED DATE |
|---|---|
| Bidding Procedures Objection Deadline | Seven (7) day(s) prior to Bidding Procedures Hearing |
| Bidding Procedures Hearing | February 7, 2023, at 3:00 p.m. |
| Bid Deadline | March 3, 2023 |
| Deadline to file and serve Auction and Sale Notice | Within five (5) business days of entry of the Bidding Procedures Order |
| Deadline to publish Auction and Sale Notice | Within five (5) business days of entry of the Bidding Procedures Order |
| Deadline to file and serve Cure Notice | Within two business (2) days after entry of the Bidding Procedures Order |
| Cure Objection Deadline | February 28, 2023 |
| Supplemental Cure Objection Deadline | Within seven (7) days of the date of the Supplemental Cure Notice |
| Sale Objection Deadline | February 28, 2023 |
| Auction | March 7, 2023 |
| Successful Bidder Adequate Assurance Objection Deadline | March 10, 2023 |
| Sale Hearing | March 13, 2023, or as soon thereafter as the Court's calendar permits |

14. With the exhaustive marketing to date, the Debtors submit that a lengthy process in these Chapter 11 Cases will not result in any materially better offers than those the Debtors expect to receive prior to the Bid Deadline.

15.     Moreover, the Debtors do not have the liquidity to support a protracted sale process and may be unable to complete a sale on a longer timeline to the detriment of their estates and creditors.  The Debtors, therefore, submit that the proposed timeline is reasonable and allows parties sufficient time to conduct diligence and engage in the proposed process while accommodating the constraints imposed by the Debtors' liquidity situation.

**The Bidding Procedures, the Auction and the Sale Hearing**

16.     The Bidding Procedures seek to maximize the value of the Debtors' estates by facilitating an open and competitive sale of the Assets, while taking into account the pressing need for the Debtors to sell the Assets as quickly as possible.  Pursuant to the Bidding Procedures, the Debtors will consider bids to acquire the Assets.[4]

17.     The Debtors are seeking approval of the Bidding Procedures to establish an open process for the solicitation, receipt and evaluation of bids on a timeline that allows the Debtors to consummate a Sale of Assets in a manner that maximizes value for the estate.  As explained above, the current marketing process for the Assets began well before the Petition Date, in late August 2022.

18.     In light of the foregoing, the Debtors have determined that the Bidding Procedures are in the best interests of the Debtors' estates and provide interested parties with sufficient opportunity to participate.

19.     Since the Petition Date, the Debtors and their advisors have continued to market the Debtors' business with hopes of identifying a strategic or market participant to serve as a

---

[4]      As noted above, the Debtors believe that a sale of all of the Assets will maximize value for stakeholders and can be accomplished most efficiently.  However, because the Debtors permitted interested parties to submit offers for only one (1) of the Business Units, under certain limited circumstances, as set forth in the Bidding Procedures, the Debtors reserve their right to consider bids for the separate Business Units, provided, among other things, that the Debtors receive offers for both Business Units and are able to dispose of both of the Business Units without any expense to the Debtors' estates.

stalking horse bidder (a "**Stalking Horse Bidder**").  At this time, however, the Debtors have not been able to secure a Stalking Horse Bidder, but discussions with parties persist and the Debtors believe they can identify a Stalking Horse Bidder and will be able to enter into a Stalking Horse Agreement (as defined below) prior to the Bidding Procedures Hearing.

20.      In that regard, if the Debtors select a Stalking Horse Bidder prior to the Bidding Procedures Hearing, the Debtors propose to file with the Court a notice (a "**Stalking Horse Notice**") (a) identifying the Stalking Horse Bidder, the material terms of the bid by the Stalking Horse Bidder (the "**Stalking Horse Bid**") (including the purchase price and Assets subject to the Stalking Horse Bid), and the amount and form of any bid protections offered to the Stalking Horse Bidder, and (b) attaching a copy of the relevant agreement (the "**Stalking Horse Agreement**"), and intend to seek approval of the Stalking Horse Agreement at the Bidding Procedures Hearing.

21.      Alternatively, if the Debtors are unable to secure a Stalking Horse Bid prior to the Bidding Procedures Hearing, the Debtors request authority to later secure one (after the Bidding Procedures Hearing but prior to the Auction).  In connection therewith, the Debtors request that they be authorized to provide certain bidding protections to a prospective Stalking Horse Bidder. Accordingly, if required by a prospective Stalking Horse Bidder as a condition to such Stalking Horse Bidder's execution of a Stalking Horse Agreement, the Debtors request authority to enter into a Stalking Horse Agreement that grants the Stalking Horse Bidder (i) a break-up fee (the "**Break-Up Fee**") up to three percent (3%) of the aggregate Purchase Price plus (ii) the reimbursement of all expenses (the "**Expense Reimbursement**") of the Stalking Horse Bidder in connection with the negotiation and consummation of the Sale Transaction (including, without limitation, reasonable attorneys' fees and expenses) up to an aggregate amount of $150,000, and

(iii) "topping" bid protection of in an amount that will be sufficient to satisfy the Break-Up Fee and the Expense Reimbursement plus a minimum incremental amount of $225,000 (together, the "**Bid Protections**").

22.      If the proposed Stalking Horse Agreement seeks bid protections that do not exceed the Bid Protections, and the Stalking Horse Bidder is not an insider (as defined in section 101(31) of the Bankruptcy Code), the Debtors seek authority to submit an order under certification of counsel approving the designation of the Stalking Horse Bidder and Stalking Horse Agreement as a stalking horse without the need for further hearing; *provided, however*, (i) if an objection to the Stalking Horse Notice is filed or (ii) a Stalking Horse Bidder and Stalking Horse Agreement are designated that exceed the amount of the Bid Protections, the Debtors will schedule a hearing prior to the Auction to consider approval of the designation of the Stalking Horse Bidder and Stalking Horse Agreement as a stalking horse to be held on the first date the Court is available.

23.      Having the flexibility to designate a Stalking Horse Bidder and provide certain Bid Protections will provide the Debtors with the ability to maximize the value of the Assets. Given the Debtors' need to maximize value for creditors and other stakeholders through a timely and efficient marketing and Sale process, the ability to designate a Stalking Horse Bidder and offer Bid Protections to such bidder (although the Debtors ultimately may, in the exercise of their business judgment, not designate a Stalking Horse Bidder at all) is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

64863/0001-44342174v1

24.     While all interested bidders should read the Bidding Procedures in their entirety, the following sets forth a summary of the key provisions of the Bidding Procedures, including those provisions required to be highlighted under Local Rule 6004-1:[5]

| Participation Requirements | To receive due diligence information, including full access to the Debtors' electronic data room and to additional non-public information regarding the Debtors, a Potential Bidder must deliver, to the extent not already delivered, the following documents (collectively, the "Preliminary Bid Documents") by email to each of: (i) Cole Schotz; (ii) SOLIC and (iii) Northland (collectively, the "Bid Recipients"):<br><br>   a.  an executed confidentiality agreement on terms acceptable to the Debtors, to the extent not already executed;<br>   b.  the identity of the Potential Bidder and a list of contacts for the Potential Bidder;<br>   c.  a description of the diligence the Potential Bidder seeks to conduct; and<br>   d.  evidence by the Potential Bidder of its financial capacity to close a proposed transaction, which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, the party that will bear liability for a breach). |
|---|---|
| Bid Deadline | A Bidder that desires to make a Bid shall transmit such proposal, solicitation, or offer via email to each of the Bid Recipients so as to be actually received by them on or before **March 3, 2023, at 4:00 p.m.** (ET) (the "Bid Deadline"). |
| Bid Requirements | To be selected to acquire the Assets or to be eligible to participate in the Auction, if applicable, a Potential Bidder (other than a Stalking Horse Bidder) must deliver to the Debtors and their advisors a written, irrevocable and binding offer for purchase of the Assets that must be determined by the Debtors in their business judgment to satisfy each of the following conditions (collectively, the "Bid Requirements").<br><br>   a.  Identity of Assets: Each Bid must state that it is acquiring all Assets.<br><br>   b.  Purchase Price: Each Bid must clearly set forth the terms of any proposed transaction (the "Purchase Price").  The |

---

[5]     This summary is qualified in its entirety by the Bidding Procedures.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meaning ascribed such term in the Bidding Procedures.  To the extent there are any conflicts or inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

Purchase Price should be a single point value in U.S. dollars for the total enterprise value of the Assets the Potential Bidder seeks to acquire on a cash-free, debt-free basis.

c.  Good Faith Deposit: Each Bid must be accompanied by a cash deposit in an amount equal to 10% of the aggregate value of the cash and non-cash consideration of the Bid to be held in an escrow account to be identified and established by the Debtors (the "Deposit").  To the extent a Bid is modified before, during, or after the Auction in any manner that increases the purchase price contemplated by such Bid, the Debtors reserve the right to require that such Bidder increase its Deposit so that it equals 10% of the increased value of the aggregate value of the cash and non-cash components of the proposed Transaction.

d.  Marked Agreement: Each Bid must be accompanied by executed transaction documents, including a draft purchase agreement (the "APA" or "Asset Purchase Agreement"), the form of which will be available to each Potential Bidder prior to the Bid Deadline and in the case of an Auction with a Stalking Horse Bidder, a markup of the Stalking Horse Agreement, including the exhibits and schedules related thereto and any related Transaction documents or other material documents integral to such Bid, pursuant to which the Bidder proposes to effectuate the Transaction (collectively, the "Transaction Documents").  Each Bidder's APA must provide (i) a commitment to close within two business days after all closing conditions are met, and (ii) a representation that the Bidder will use its reasonable best efforts to satisfy all applicable regulatory conditions.

e.  Committed Financing: To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Bid must include evidence of committed financing (debt or equity funding, as applicable), including the identity and contact information of the specific person(s) or entity(s) responsible for such committed funding whom the Debtors' professionals should contact regarding such funding, that demonstrates that the Bidder has received sufficient debt and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be acceptable to the Debtors (in consultation with any statutorily appointed committee in these Chapter 11 Cases) and must be unconditional and not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

f.   Contingencies; No Financing or Diligence Outs: A Bid shall not be conditioned on a Bidder obtaining, or the sufficiency of, financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' reasonable business judgment, after consultation with any statutorily appointed committee in these Chapter 11 Cases, than those contemplated by the Stalking Horse Bid, if any, and each Bid must identify with particularity each and every condition to closing, including the executory contracts and unexpired leases for which assumption and assignment is required.  The Potential Bidders are expected to have completed all of their due diligence by the Bid Deadline, including all business, legal, accounting, and other confirmatory diligence.  The extent and nature of any remaining due diligence should be set forth in a specific list attached to each Bid.

g.   Identity: Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' advisors should contact regarding such Bid.

h.   Authorization: Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid.

i.   Compliance with the Bankruptcy Code and Non-Bankruptcy Law; Acknowledgement. Each Bid must comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law. Each Bid must also include a written acknowledgment that the Bidder agrees to all of the terms of the Sale set forth in the Bidding Procedures.

j.   As-Is, Where-Is: The Sale of the Assets shall be as-is, where-is. Each Bid must include a written acknowledgement and representation that the Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents

13

and/or the Assets in making its Bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Transaction Documents.

k.  Expenses; Disclaimer of Fees: Each Bid (other than a Stalking Horse Bid) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Potential Bidder (other than a Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting a Bid any Potential Bidder is waiving any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l.  Adequate Assurance of Future Performance: Each Bid (other than a Stalking Horse Bid) must (1) identify the Contracts to be assumed and assigned in connection with the proposed acquisition, (2) provide for the payment of all Cure Amounts related to such Contract by the Potential Bidder, and (3) demonstrate, in the Debtors' reasonable business judgment, that the Potential Bidder can provide adequate assurance of future performance under all such Contracts.

m.  Joint Bids: The Debtors are authorized to approve joint Bids in their reasonable discretion on a case-by-case basis.

n.  Backup Bid: Each Bid shall provide that the Potential Bidder will serve as a Backup Bidder if the Potential Bidder's Bid is the next highest or otherwise best Bid.

o.  Expected Closing Date: Each Bid shall state the Potential Bidder's expected date of closing of the Sale, which shall be no later **March 27, 2023;** *provided,* that such closing date may be extended pursuant to the terms of an asset purchase agreement.

| **Designation of Qualified Bidders** | A Bid will be considered a "Qualified Bid," and each Bidder that submits a Qualified Bid will be considered a "Qualified Bidder," if the Debtors, in consultation with any statutorily appointed committee in these Chapter 11 Cases, determine that such Bid: |
| --- | --- |
| | a.   satisfies the Bid Requirements; |

14

| | |
|---|---|
| | b.   is reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined below), within a timeframe acceptable to the Debtors (in consultation with any statutorily appointed committee in these Chapter 11 Cases); and<br><br>c.   within 24 hours after the Bid Deadline, the Debtors (after consulting with any statutorily appointed committee in these Chapter 11 Cases) will notify each Qualified Bidder whether such party is a Qualified Bidder and shall provide the Notice Parties (as defined below) with a copy of each Qualified Bid.<br><br>If any Bid is determined not to be a Qualified Bid, the Debtors will refund such Bidder's Deposit promptly after the Bid Deadline. |
| **The Auction** | If one or more Qualified Bids are received by the Bid Deadline, then the Debtors shall conduct the Auction with respect to the Assets. The Auction shall commence on **March 7, 2023 (prevailing Eastern Time) at 9:00 a.m. (prevailing Eastern Time),** via live auction and/or remote video, or such later time or other place as the Debtors determine, in which case the Debtors shall timely notify all Qualified Bidders of such later time or other place, and file a notice of the change on the Court's docket for these Chapter 11 Cases. |
| **Provisions Governing the Auction** | The Auction will be conducted in accordance with the following procedures (the "<u>Auction Procedures</u>").<br><br>a.   The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid.<br><br>b.   Only Qualified Bidders that have submitted Qualified Bids by the Bid Deadline are eligible to participate in the Auction, subject to the terms of the Bidding Procedures and other limitations as may reasonably be imposed by the Debtors. Qualified Bidders participating in the Auction must appear at the Auction in person or through a duly authorized representative.<br><br>c.   Any party in interest may attend (but not participate in) the Auction if any such party in interest provides the Debtors with written notice of its intention to attend the Auction on or before the Bid Deadline, which written notice shall be sent to proposed counsel for the Debtors via electronic mail, to Patrick J. |

Reilley, Esq. at preilley@coleschotz.com.  For the avoidance of doubt, only Qualified Bidders will be entitled to make any Bids at the Auction.

d.  Terms of Overbids:

(i)  <u>Minimum Overbid</u>. Any Overbid, including any Bids by a Stalking Horse Bidder must be made in minimum increments of $225,000 (or such other amount as the Debtors may determine after consultation with any statutorily appointed committee in these Chapter 11 Cases) of additional value (including after payment of the Bid Protections to any Stalking Horse Bidders, if applicable).

(ii)  <u>Conclusion of Each Overbid Round</u>. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (the "<u>Overbid Round Deadline</u>"), subject to extension by the Debtors, by which time any Overbids must be submitted to the Debtors.

(iii)  <u>Overbid Alterations</u>. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid and shall otherwise comply with the terms of the Bidding Procedures.

(iv)  <u>Announcing Highest Bid</u>. After each Overbid Round Deadline, the Debtors shall determine, in consultation with any statutorily appointed committee in these Chapter 11 Cases and taking into account the Bid Assessment Criteria, whether an Overbid is higher or otherwise better than the Baseline Bid in the initial Overbid round or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>").  The Debtors shall announce and describe to all Qualified Bidders present at the Auction the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid, the identity of the bidder with the Prevailing Highest Bid, as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

e.  The Debtors, in consultation with any statutorily appointed committee in these Chapter 11 Cases, reserve the right to adjourn the Auction as necessary to (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) provide

16

| | |
|---|---|
| | Qualified Bidders with additional time to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to offer such additional evidence as the Debtors may require, such as with respect to financial capacity or sufficient funding or financing, in order to consummate the proposed Transaction at the prevailing Overbid amount. |
| | f. The Auction shall continue until there is only one Qualified Bid that the Debtors determine, after consultation with any statutorily appointed committee in these Chapter 11 Cases, and taking into account the Bid Assessment Criteria, to be the highest or otherwise best Qualified Bid for the Assets. Such Qualified Bid shall be declared the "Successful Bid," and such Qualified Bidder, the "Successful Bidder," and the Auction will be closed. Such acceptance by the Debtors of the Successful Bid (to be made in accordance with the terms of section VI(d) of the Bidding Procedures) is conditioned upon approval by the Court of the Successful Bid.  Following the closing of the Auction, the Debtors shall not initiate contact with, solicit, or encourage proposals from any person or entity with respect to the Assets. |
| | g. Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding, (ii) its Qualified Bid is a good-faith *bona fide* offer, and (iii) it intends to consummate the proposed Transaction if selected as the Successful Bidder. |
| **Backup Bidder** | If an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets shall be required to serve as a backup bidder (the "<u>Backup Bidder</u>") until such time that the Sale to the Successful Bidder is consummated, but no later than thirty (30) days past the Sale Hearing, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.<br><br>The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder (the "<u>Backup Bid</u>") shall be announced by the Debtors, after consultation with any statutorily appointed committee in these Chapter 11 Cases, at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until such time that the Transaction is consummated. The Backup Bidder's Deposit shall be held in escrow pending consummation of the Sale to the Successful Bidder.<br><br>If a Successful Bidder fails to consummate the approved Transaction contemplated by its Successful Bid, the Debtors may select the |

| | |
|---|---|
| | Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance. |
| **Reservation of Rights** | The Debtors reserve their rights to modify the Bidding Procedures, after consultation with any statutorily appointed committee in these Chapter 11 Cases, in any manner that they reasonably determine will best promote the goals of the Bidding Procedures, or impose, at or prior to the Auction, additional customary terms and conditions in connection with a Sale, including, without limitation: (a) extending the deadlines set forth in the Bidding Procedures; (b) adjourning the Auction at the Auction; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids.<br><br>For the avoidance of doubt and notwithstanding anything to the contrary herein, nothing in the Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor to take any action or to refrain from taking any action related to any sale transaction to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under the applicable law. Further, nothing in the Bidding Procedures or the Bidding Procedures Order shall diminish the right of the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives to: (a) consider, respond to, and facilitate alternate proposals for sales or other restructuring transactions involving any or all of the Assets (each, an "Alternate Proposal"); (b) provide access to nonpublic information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternate Proposals; and enter into or continue discussions or negotiations with holders of claims against or equity interests in a Debtor or any other party in interest in these Chapter 11 Cases or any other entity regarding Alternate Proposals. |

**Assumption and Assignment of Executory Contracts and Unexpired Leases**

25.     To facilitate and consummate the sale of the Assets, the Debtors seek authority to

assume and assign Contracts and Leases following the Auction, if any, pursuant to section 365(f)

of the Bankruptcy Code (collectively, the "**Assigned Contracts**").  Due to the nature of the

bidding process, it is impossible for the Debtors to currently identify which such contracts or

leases will require assumption and assignment to the Successful Bidder.  As such, the Debtors

further seek authority to establish the following Assumption and Assignment Procedures:[6]

    a.    **Cure Notice**. Within two (2) business days after entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice on **Contract Counterparties**"), and post the Cure Notice to the restructuring website (https://cases.ra.kroll.com/AVCT). The Debtors may provide supplemental Cure Notices if they discover Contracts and Leases inadvertently omitted from the initial Cure Notice or such notice erroneously reports the Cure Amount.  Contract Counterparties shall have seven (7) days from the service date of such supplemental Cure Notice to file and serve an objection in the manner described herein (the "**Supplemental Cure Objection Deadline**").

    b.    **Content of Cure Notice**. The Cure Notice shall notify the applicable Contract Counterparty that the Contracts and Leases may be subject to assumption and assignment in connection with the Sale, and contain the following information: (i) a list of the applicable Contracts and Leases that may be assumed and assigned in connection with the Sale (each, an "**Assigned Contract**" and, collectively, the "**Assigned Contracts**"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary to cure all monetary defaults, if any, under each Assigned Contract (the "**Cure Amount**"); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "**Cure Objection**"); *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any

---

[6]     This summary is qualified in its entirety by the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meaning ascribed such term in the Bidding Procedures Order.  To the extent there are any conflicts or inconsistencies between this summary and the Bidding Procedures Order, the terms of the Bidding Procedures Order shall govern in all respects.

64863/0001-44342174v1

point by the Debtors or assumed and assigned pursuant to any Successful Bid.

c.     **Cure Objections**. Cure Objections, if any, to a Cure Notice must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules, and any order governing the administration of these Chapter 11 Cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Amounts, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court prior to **February 28, 2023, at 4:00 p.m. (prevailing Eastern time)** (the "**Cure Objection Deadline**"); *provided* that the Debtors may extend the Cure Objection Deadline by filing a notice of such modification on the Court's docket. A properly filed Cure Objection shall be heard at the Sale Hearing or such later date as may be agreed upon by the parties or fixed by the Court.

d.     **Dispute Resolution**. Any Cure Objection to the proposed assumption and assignment of an Assigned Contract or Cure Amounts that remains unresolved after the Sale Hearing shall be heard at such later date as may be agreed by the parties or fixed by the Court. To the extent that any Cure Objection cannot be resolved by the parties, such Contract or Lease shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the Successful Bidder's reasonable discretion. To the extent a Cure Objection remains unresolved, the Contract or Lease may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing. If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such contract or lease should be excluded and not assigned, in which case the Successful Bidder will not be responsible for any Cure Amounts in respect of such Contract or Lease. Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Amounts (any such objection, a "**Cure Dispute**"), the applicable Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited into a segregated account held by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution thereof.

e.     **No Cure Objections**. If there are no Cure Objections, or if a Contract Counterparty does not file and serve a Cure Objection in a manner that is consistent with the requirements set forth herein, (i) the Cure Amounts, if any, set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Contract, Lease or any other document,

64863/0001-44342174v1

and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract or Lease and the Cure Amounts, if any, will be forever barred from objecting to the assumption or assumption and assignment of such Contract or Lease and rights thereunder, including the Cure Amounts, if any, and from asserting any other claims related to such Contract or Lease against the Debtors or the Successful Bidder, or the property of any of them.

26.     Any objection to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract must be filed with the Court at least one (1) business day prior to the Sale Hearing (the "**Successful Bidder Adequate Assurance Objection Deadline**").

### Disclosures Under Local Rule 6004-1(b)

27.     Local Rule 6004-1(b) requires, among other things, that any motion to sell property of the estate pursuant to section 363 of the Bankruptcy Code attach "[a] copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the debtor reasonably believes it will execute in connection with the proposed sale [and a] copy of a proposed form of sale order."  Del. Bankr. L. R. 6004-1(b).  As set forth above, the Debtors and their professionals have commenced an aggressive marketing of the Assets.  Nevertheless, the Debtors do not, as yet, have a signed agreement (or even the form of agreement that it believes it will reasonably execute in connection with a Sale).  Moreover, because the Debtors continue to negotiate with parties in interest, they cannot, as yet, identify, with any reasonable specificity, the terms of the sale of the Assets.  Accordingly, the Debtors are unable, at this time to file any agreement or make the disclosures required under Local Rule 6004-1(b).  However, in the event the Debtors secure a Stalking Horse Bidder, the Debtors will file the Stalking Horse Agreement and make the requisite disclosures in the Stalking Horse Notice.

21

**Applicable Notices**

28.     In accordance with Bankruptcy Rule 2002(a) and (c), within two (2) business days of entry of the Bidding Procedures Order or as soon as practicable thereafter, the Debtors (or their agents) shall serve by first-class mail the Auction and Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, upon: (a) the Office of the United States Trustee; (b) the United States Securities & Exchange Commission; (c) all applicable federal, state and local taxing authorities, including the Internal Revenue Service; (d) the Office of the Attorney General in each state in which the Debtors operate; (e) the United States Attorney's Office for the District of Delaware; (f) the United States Attorney General's Office for the District of Delaware; (g) all of the Debtors' known creditors; (h) counsel to any statutorily appointed committee; (i) any party known or reasonably believed to have asserted any lien, claim, or encumbrance or other interest in the Assets; (j) any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Assets; and (k) any parties that have requested notice in these Cases pursuant to Bankruptcy Rule 2002.

29.     The Auction and Sale Notice will indicate that copies of this Motion and the Bidding Procedures can be obtained on the website maintained by the Debtors' claims and noticing agent, Kroll Restructuring Administration at https://cases.ra.kroll.com/AVCT.  The Auction and Sale Notice will also indicate the deadline for objecting to the Sale to the Successful Bidder and the date and time of the Sale Hearing.  The Debtors request that such notice be deemed to be sufficient and proper notice of the Sale with respect to known interested parties.

30.     The Debtors also propose, pursuant to Bankruptcy Rules 2002 and 6004, to publish, within five (5) business days of entry of the Bidding Procedures Order, a notice of the Sale, in substance substantially similar to the Auction and Sale Notice, in *The Wall Street Journal*, *The New York Times* or *USA Today*.  The Debtor requests that such Publication Notice

be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

## BASIS FOR RELIEF

### A.    APPROVAL OF THE SALE IS APPROPRIATE UNDER SECTION 363 OF THE BANKRUPTCY CODE

31.    Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification for the sale or use of assets outside the ordinary course of business. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175 76 (D. Del. 1991).

32.    Once a court determines that a valid business justification exists for a sale outside of the ordinary course of business, courts must determine whether: (a) adequate and reasonable notice of the sale was given to interested parties, (b) the sale will produce a fair and reasonable price for the property, and (c) the parties have acted in good faith.  *In re Elpida Memory, Inc.*, No. 12 10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012); *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).  As described below, the proposed Sale meets each of these requirements.

### B.    THE SALE REPRESENTS A SOUND EXERCISE OF DEBTORS' BUSINESS JUDGMENT

33.    Here, a strong business justification exists for the Sale.  As described above and in the First Day Declaration, the Debtors have determined, in consultation with their advisors and following a review of their financial alternatives and strategies, that a sale process is the most effective way to maximize value for all stakeholders.  As a result, an expeditious sale of the

23

Assets is a reasonable exercise of the Debtors' business judgment and is in the best interests of all of the Debtors' stakeholders.

## C.    BIDDING PROCEDURES ARE FAIR AND DESIGNED TO MAXIMIZE VALUE

34.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See, e.g.*, *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1998)).

35.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales.  *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 659 (stating such procedures should "encourage bidding and [ ] maximize the value of the Debtors' assets"); *In re Financial News Network, Inc.*, 126 B.R. at 156 (S.D.N.Y. 1991) (stating that "court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [ ] provide for a fair and efficient resolution of bankrupt estates").

36.    Here, the proposed Bidding Procedures will allow and encourage interested parties to submit competing bids at the Auction, thereby maximizing the value that the Debtors will receive for the Assets.  By inviting all potential purchasers to participate in the Auction, the Debtors will be able to determine the highest and best price possible for the Assets.  The Bidding

Procedures will increase the likelihood that the Debtors will receive the greatest consideration possible for the Assets and will facilitate a competitive and fair bidding process.

37.     The proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  The Bidding Procedures (a) will encourage, rather than hinder, bidding for the Assets; (b) are consistent with other procedures previously approved by courts in this district; and (c) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  *In re Randall's Island Family Golf Ctrs., Inc.*, 261 B.R. 96 (Bankr. S.D.N.Y. 2001) *aff'd*, 272 B.R. 521, (S.D.N.Y. 2002); *In re Integrated Res., Inc.*, 147 B.R. at 650-56; *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989).

## D.     THE BID PROTECTIONS HAVE A SOUND BUSINESS PURPOSE AND SHOULD BE APPROVED.

38.     The Debtors are also seeking authority pursuant to the Bidding Procedures to designate a Stalking Horse Bidder and offer Bid Protections to such Stalking Horse Bidder.  The Debtors seek to utilize such authority only in their discretion if the Debtors determine in their business judgment that such Bid Protections will likely facilitate a competitive bidding and auction process.

39.     The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases because the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."  *See Official Comm. Unsecured Creditors v. Interforum Holding LLC,* No. 11-CV-219, 2011 WL 2671254, at*1 n. 1 (E.D. Wisc. July 7, 2011). As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other

25

forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (citation omitted). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

40. The Debtors believe that the Bid Protections are necessary to attract and retain a Stalking Horse Bidder. Any Bid Protections will be negotiated through back-and-forth, arm's length negotiations. By inducing a Stalking Horse Bidder to hold its offer open as a baseline from which other potential bidders can submit higher or better offers, the Bid Protections will serve to encourage more competitive bidding, which will likely increase the purchase price of the Assets. As such, the Bid Protections will, among other things, enable the Debtors to maximize the value of their estates for the benefit of all economic stakeholders in these Chapter 11 Cases.

41. The United States Court of Appeals for the Third Circuit has established standards for determining the propriety of bidding incentives in the bankruptcy context. *See O'Brien Envtl. Energy, Inc.,* 181 F.3d at 533-38; *see also In re Reliant Energy Channelview LP,* 594 F.3d 200, 205 (3d Cir. 2010) (noting that *O'Brien* "set forth the controlling legal principles" applicable to bidding incentives). The Court has held that even though bidding incentives, including break-up fees, are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. *See O'Brien Envtl. Energy,* 181 F.3d at 535. Accordingly, bidding incentives must provide some post-petition benefit to the debtor's estate in order to be approved. *See In re Energy Future Holdings Corp.,* 904 F.3d 298, 314 (3rd Cir. 2018); *O'Brien Envtl. Energy,* 181 F.3d at 533. With respect to break-up fees, the standard is generally satisfied

26

if the bid protections promote a more competitive process, for example. *O'Brien Envtl. Energy,*

181 F.3d at 537.

42.     Moreover, the Bid Protections are necessary to preserve the value of the estate

and would likely be necessary to secure a Stalking Horse Bidder's commitment.  As such, the

Bid Protections provide the Debtors with a platform from which to ensure a value-maximizing

transaction for the benefit of their estates, creditors, and stakeholders.  Moreover, payment of the

Bid Protections is customary and will not diminish the Debtors' estates as the amount of the Bid

Protections will be covered in the minimum initial Overbid amount.

**E.      THE ASSETS SHOULD BE SOLD FREE AND CLEAR OF CLAIMS, LIENS, AND ENCUMBRANCES UNDER SECTION 363(F) AND SUCCESSOR LIABILITY CLAIMS**

43.     The Debtors also submit that the Sale of the Assets should be free and clear of any

and all Interests under section 363(f) of the Bankruptcy Code (other than assumed liabilities and

permitted encumbrances as provided in the purchase agreement for the Successful Bid or Backup

Bid, as applicable).  Section 363(f) of the Bankruptcy Code permits a debtor to sell property free

and clear of third-party liens, claims and interests only if:

> (1) applicable nonbankruptcy law permits sale of such property
> free and clear of such interests; (2) such entity consents; (3) such
> interest is a lien and the price at which such property is to be sold
> is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or (5) such entity could be
> compelled, in a legal or equitable proceeding, to accept a money
> satisfaction of such interest.

11 U.S.C. § 363(f).  Since section 363(f) of the Bankruptcy Code is written in the disjunctive;

any of the five conditions provides authority to sell free and clear of Interests.  *See In re Pacific*

*Energy Resources Ltd., et al.*, Case No. 09-10785 (KJC) (Bankr. D. Del. Aug. 18, 2009); *In re*

*Flying J Inc., et al.*, Case No. 08-13384 (MFW) (Bankr. D. Del. July 27, 2009); *In re Collins,*

180 B.R. 447, 450 (Bankr. E.D. Va. 1995); *In re Dundee Equity Corp.*, 1992 WL 53743, at *4

(Bankr. S.D.N.Y. Mar. 6, 1992).

44.     No party holds an Interest in the Assets.  However, even to the extent there is a

party that will assert an Interest in the Assets (and such Interest is not otherwise assumed or

determined to be a permitted encumbrance under the Successful Bid or Backup Bid, as

applicable), the Debtors submit that they will satisfy at least one of the five conditions of

section 363(f) of the Bankruptcy Code.  For example, in the event one of the conditions of

section 363(f)(1)-(4) could not be satisfied, the Debtors may still sell the Assets free and clear of

any Interest under section 363(f)(5) of the Bankruptcy Code because the Interests on any of the

Assets sold will attach to the cash proceeds of the Sale in their order of priority and entities

holding such interests could be compelled to accept money satisfaction in legal or equitable

proceedings.  Accordingly, pursuant to section 363(f) of the Bankruptcy Code, the Debtors may

sell the Assets free and clear of all Interests.

45.     Moreover, the Debtors will send the Auction and Sale Notice to all known

creditors (and the Publication Notice will bind all other creditors).  Thus, any purported

lienholder will have notice of the Sale.  If any such purported lienholder fails to object to the

proposed Sale, then such lienholder's consent should reasonably be presumed.  Accordingly, the

Debtors request that unless a party asserting an Interest on or in any of the Assets (other than

with respect to assumed liabilities and permitted encumbrances) timely objects to this Motion,

such party shall be deemed to have consented to any Sale approved at the Sale Hearing.  *See*

*Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale

motion, creditor deemed to consent); *Pelican Homestead v. Wooten*, 61 B.R. 661, 667 (Bankr.

W.D. La. 1985) (same); s*ee also*, *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC,* 327 F.3d

537, 548 (7th Cir. 2003) (finding that a lessee who did not object to the Sale Order or seek adequate protection had no additional recourse when leasehold interest was sold through a §363 sale).

46.    It is also appropriate to sell the Assets free and clear of successor liability relating to the Debtors' businesses.  Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Ormet*, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an under-funded pension plan); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

47.    The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, potential bidders may choose not to participate in the Auction or, if they did, would submit reduced bid amounts.  To that end, the Successful Bidder

should not be liable under any theory of successor liability relating to the Debtors' businesses but should hold the Assets free and clear.

## F.    THE SUCCESSFUL BIDDER SHOULD BE ENTITLED TO THE PROTECTIONS OF SECTION 363(m) OF THE BANKRUPTCY CODE

48.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147; *see also In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Temtechco, Inc.*, 1998 WL 887256, at \*5 (D. Del. 1998); *In re Congoleum Corp.*, 2007 WL 1428477, at \*2 (Bankr. D.N.J. May 11, 2007).

49.    These Chapter 11 Cases and the proposed Bidding Procedures are aimed at further marketing the Assets in an exhaustive, yet efficient fashion.  The Debtors diligently formulated the Bidding Procedures to ensure an open, fair process.  Of note, the Bidding Procedures provide for the continuation of a sale process that the Debtors pursued prepetition and they permit Bids for the Assets.  Pursuant to the Bidding Procedures, the Debtors will consider all Qualified Bids to ensure an arms' length, good faith sale process.

50.    At the Sale Hearing the Debtors will make a record that any Successful Bidder is a "good faith" purchaser.  Accordingly, the Debtors request that the Sale Order include a provision that the Successful Bidder for the Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors maintain that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets.

## G.    ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES SHOULD BE AUTHORIZED

51.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or [unexpired]

30

lease of the debtor."  11 U.S.C. § 365(a).  Courts use the business judgment standard to determine whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (stating that the assumption or rejection of a lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject an executory contract is governed by the "business judgment" standard).  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) *quoting In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y.1984).  A more exacting scrutiny would harm the estate through increased costs and further, "would slow the administration of a debtor's estate, . . . interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11.  Pursuant to section 105(a) of the Bankruptcy Code, a court may issue orders or decrees that help preserve or protect the value of a debtor's assets.  *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

52.     The assumption and assignment of Contracts and Leases, as designated by the Successful Bidder, is crucial to the Debtors' ability to obtain the best value in connection with the Sale and falls well within the reasonable exercise of the Debtors' business judgment.

Pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory

contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any

default which is required to be cured, including compensating or providing adequate assurance of

prompt compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C.

§ 365(b)(1).  Once an executory contract is assumed, the trustee or debtor in possession may

elect to assign it.  *See In re Rickel Home Centers, Inc*., 209 F.3d 291, 299 (3d Cir. 2000) ("The

Code generally favors free assignability as a means to maximize the value of the debtor's

estate").  Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an

executory contract … only if the trustee assumes such contract … and adequate assurance of

future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of

future performance" depends on the facts and circumstances of each case, but should be given

"practical, pragmatic construction."  *Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*,

103 B.R. 524, 538 (Bankr. D.N.J. 1989).  Among other things, adequate assurance may be given

by demonstrating the assignee's financial health and experience in managing the type of

enterprise or property assigned.

53.     The Debtors respectfully submit that the Assumption and Assignment Procedures

are appropriate and reasonably tailored to provide Contract Counterparties with adequate notice

of the potential assumption and assignment of their Contracts and Leases, as well as proposed

Cure Amounts, if any.  Contract Counterparties will have the opportunity to object to the Cure

Amounts listed in the Cure Notice, or to the assumption and assignment of their Contracts and

Leases on other grounds, including concerns regarding inadequate assurance of future

performance.  The Assumption and Assignment Procedures further provide that, in the event an

objection is not resolved, the Court will determine the disputed issues.  Accordingly, the Debtors

submit that implementation of the Assumption and Assignment Procedures is appropriate under the facts and circumstances of the Chapter 11 Cases and the proposed Sale.

54.     For the foregoing reasons, the Debtors submit that the assumption and assignment to the Successful Bidder of the Debtors' Contracts and Leases should be approved as an exercise of the Debtors' sound business judgment.

## H.    THE MANNER OF NOTICE AND SCHEDULE FOR THE BID DEADLINE AND THE AUCTION AND SALE HEARING ARE REASONABLE AND APPROPRIATE UNDER THE CIRCUMSTANCES

55.     The Debtors will serve the Auction and Sale Notice and the Cure Notice and propose to publish the Publication Notice in *The Wall Street Journal*, *The New York Times* or *USA Today* in accordance with the Bidding Procedures Order.  The notice of the proposed Sale to be provided by the Debtors as set forth herein sufficiently describes the terms and conditions of the proposed Sale.

56.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this Motion and the related notices satisfy all such requirements:

    a.     <u>Section 363 Notice</u> – section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing."  Under Section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."  11 U.S.C. § 102(1)(A).  As set forth above, creditors will be provided notice of the salient details regarding this Motion and the Sale Hearing through service of the Auction and Sale Notice and this Motion, each as described herein.  Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

    b.     <u>Bankruptcy Rule 2002</u> – Bankruptcy Rule 2002 requires twenty-one (21) days' notice of the proposed sale of property other than in the ordinary course of business.   In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing

objections." Fed. R. Bankr. P. 2002.  Debtors submit that such notice provision is satisfied based on their proposed timeline and schedule.

c.   <u>Bankruptcy Rules 6004 and 6006</u> – Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business complies with Bankruptcy Rule 2002.  As set forth above, the Debtors have complied with Bankruptcy Rule 2002.  Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the non-Debtor counterparty to such contract or lease, as well as on other parties in interest as the Court may direct.  The Auction and Sale Notice and the Cure Notice have been or will be served on the Contract Counterparties to the Assigned Contracts, thereby satisfying this requirement.

d.   <u>Procedural Due Process</u> – The notices of this Motion and the Sale that are being provided as described herein, including the notice being provided by publication as described herein and the Bidding Procedures Order, are "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object.  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  Parties in interest have been and should be found to have been afforded adequate notice of this Motion, the Sale, the Bidding Procedures and the other relief requested herein.

57.   The Debtors submit that the notice they have provided and intend to provide as outlined above with respect to the proposed Sale, the Bidding Procedures, the Cure Amounts, as applicable, is reasonable and appropriate and constitutes good and adequate notice of the sale of their Assets and the procedures and proceedings related thereto and therefore should be approved by this Court.

## I.   THE STAY OF THE SALE ORDER SHOULD BE WAIVED

58.   Pursuant to Bankruptcy Rules 6004(h) and 6006(d), an order authorizing the sale of property or the assignment of an unexpired lease is stayed for fourteen (14) days after the entry of an order unless the Court orders otherwise.

59.   If the sale of the Assets cannot be consummated immediately following the Auction and the Sale Hearing, it is uncertain whether the Debtors can generate sufficient cash

flow to operate.  Accordingly, the Debtors request that the automatic fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

### **NOTICE**

60.    Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the parties listed on the Debtors' consolidated list of their twenty (20) largest unsecured creditors; (c) the United States Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the Office of the United States Attorney for the District of Delaware; (f) Delaware State Treasury; (g) Delaware Secretary of State; (h) all entities known to have expressed a bona fide interest in a transaction with respect to the Assets; (i) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Assets; and (j) all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

61.    A copy of this Motion is available on (i) the Court's website: www.deb.uscourts.gov, and (ii) the website maintained by the Debtors' claims and noticing agent, https://cases.ra.kroll.com/AVCT.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested by this Motion and such further relief as may be just and proper under the circumstances.

[Remainder of Page Intentionally Left Blank]

Dated:  January 17, 2023
       Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ Patrick J. Reilley*
Patrick J. Reilley (No. 4451)
Jack M. Dougherty (No. 6784)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
preilley@coleschotz.com
jdougherty@coleschotz.com
mfitzpatrick@coleschotz.com

-and-

Michael D. Sirota (admitted *pro hac vice*)
David M. Bass (admitted *pro hac vice*)
Michael Trentin (admitted *pro hac vice*)
Conor D. McMullan (admitted *pro hac vice*)
Court Plaza North
25 Main Street
Hackensack, NJ 07601
Telephone: 201-489-3000
Facsimile: 201-489-1536
msirota@coleschotz.com
dbass@coleschotz.com
mtrentin@coleschotz.com

*Proposed Counsel for Debtors and
Debtors-in-Possession*